**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA, ex rel.** ) | |
| **SVONDO WATSON,** ) | |
| **Petitioner** ) | **No. 01 C 9101** |
| ) | |
| ) | **HONORABLE DAVID H. COAR** |
| ) | |
| **v.** ) | |
| ) | |
| ) | |
| **KENNETH R. BRILEY, Warden, Statesville** ) | |
| **Correctional Center,** ) | |
| **Respondent** ) | |

**MEMORANDUM OPINION AND ORDER**

This case comes before the Court on Petitioner Svondo Watson's ("Watson" or "Petitioner")

petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below,

the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED.

**I. Factual and Procedural Background[1]**

On June 9, 1996, following a jury trial, in the Circuit Court of DuPage County, Watson

was convicted of first degree murder, attempted first degree murder, and aggravated battery.

However, on appeal, the Appellate Court of Illinois, Second District, reversed Watson's

convictions and remanded the cause for a new trial, finding that the defendant's trial counsel was

_____

[1]Unless rebutted by clear and convincing evidence, findings of fact made by the state
courts in this case are presumed to be correct. See Foster v. Schomig, 223 F.3d 626, 631 (7th
Cir. 2000).

ineffective in failing to file a motion to suppress evidence of bullets that were found in a safe in a

bedroom closet in the first-floor apartment located at 1628 North Linder, in Chicago, Illinois.

The building searched was a two-flat building that contained separate apartments on the second

floor and first floor, with an additional basement apartment. The search warrant executed by

police permitted the officers to search the entire brick, two-story premises at 1628 North Linder

in Chicago. However, the complaint requested a search warrant for "the house" that the

defendant "was found at in Chicago." The complaint, written in narrative form by Detective Carl

Alagna ("Alagna"), also stated that Petitioner's brother, Changa Harris ("Harris"), told police

that if Watson was going to use a gun it would have been a .380-caliber gun that belonged to

Petitioner's cousin. According to the complaint, Harris also told police that Petitioner's cousin

lived at the same house with Harris and Watson.

     The Illinois Appellate Court found that it was apparent from the officers' testimony that

at time the time they requested the issuance of the warrant, the knew or reasonably should have

known that the premises consisted of separate living quarters. Additionally, the officers knew

that the defendant occupied only the second-floor apartment. Thus, the Illinois Appellate Court

found that probable cause existed to search on the second-floor apartment, not the first-floor

apartment where the incriminating evidence was found. The Illinois Appellate Court remanded

Petitioner's case to Circuit Court.

     On remand for a new trial, Petitioner filed motions to quash his arrest, to suppress

evidence seized pursuant to the execution of a search warrant, and to suppress statements

Petitioner made to police following his arrest. At the hearing on Petitioner's motions, the State

presented evidence indicating that Leo McDaniel ("McDaniel") was fatally shot while sleeping in

his apartment during the early morning hours of June 7, 1994. McDaniel's girlfriend, Keisha Twitty ("Twitty"), was present during the shooting, and later identified Watson as the shooter to the police. Watson had stayed at the apartment the previous couple of nights, and was expected to return that night. Petitioner had a key to the apartment, and was the only other person besides McDaniel and Twitty with a key to the apartment. Twitty specifically remembered locking the door before she went to bed that night, and there was no forced entry. The police found a receipt with Petitioner's address in McDaniel's apartment. When the police went to the location mentioned on the receipt, they found a vehicle matching the description of the type of vehicle driven by Petitioner.[2] Upon arriving at Watson's apartment, Petitioner told police that "Svondo Watson was not there" and that "Watson had been in jail for the past two weeks." The State trial court granted Petitioner's motion to suppress items seized during the search, but denied the motion to suppress Petitioner's arrest.

The hearing continued, and Petitioner presented his motion to suppress his statements to police following his arrest. Officer Alagna testified that he arrested Petitioner and Harris around 10:00 a.m. on June 7, 1994, at Petitioner's home, and brought them to the Lombard Police Department. Officer Alanga read Watson his <u>Miranda</u> warnings, and Petitioners told the officer that he understood each of his rights, including his rights to remain silent and to have an attorney present. Petitioner then voluntarily spoke with Alagna for about 25 minutes. Officer Richard Sticka ("Sticka") was also present during the conversation. At that time, Watson denied

---

[2] The Officers were aware of the description of the car because after McDaniel's murder, one of McDaniel's neighbors, in an interview, told Officer Alagna that he saw Watson driving a tan 1989 Ford Taurus. <u>See</u> Tr. of February 24, 1998 hearing, pp. C-002381 - C-002382. The neighbor also provided the license plate number for the car. <u>Id</u>.

involvement in the shooting, but acknowledged his association with McDaniel. Alagna did not remember whether he mentioned to Petitioner that Twitty had positively identified Petitioner as the shooter. However, Alagna further testified that he did not believe that he did mention Twitty's identification to Petitioner, because he would have placed that fact in the police report if he had mentioned it. Further, Officer Alagna testified that he again spoke with Watson around 3:30 p.m. that same day. Officer Dane Cuny ("Cuny") asked Watson if he still understood his rights, and Petitioner responded that he did. According to Alagna, Petitioner did not assert any of his Miranda rights while he was present, and Alagna was not advised by anyone that an attorney had called attempting to locate Watson.

Cuny testified that he interviewed Petitioner at 3:30 p.m. on June 7, 1994, at the Lombard police station. The interview lasted about ten to fifteen minutes. Around 5:30 p.m., Cuny was informed that Petitioner wanted to speak with him. When Cuny went to the interview room, he asked Petitioner if he still understood the Miranda warnings that had been read to him earlier that day, and if Petitioner wanted to talk. Watson replied that he understood his rights, and he wanted to tell the truth. When Watson began describing specifics about where he discarded a weapon, Officer Cuny stopped the interview, because he wanted to get a notepad and bring another officer into the interview room. About five or ten minutes later, Cuny returned to the interview room, with Lombard police detective Rick Montalto ("Montalto"). At that point, Watson denied the previous admissions he had made. However, Watson did not at any time assert any of his Miranda rights, including the right to remain silent or his right to consult with an attorney. Cuny noted that he had not told Watson that he had been positively identified by Twitty.

In addition, Montalto testified that he and Sergeant Richard Spika ("Spika") took Watson

to the polygraph examining facility about two or three miles from the police station. They were at the facility for about thirty minutes when they decided to return to the station without having the polygraph test administered, because they had received a report that Harris was providing some information to the police. Montalto and Spika returned with the Watson to the police station around 2:30 or 2:45 p.m.

Montalto and Spika returned with Watson to the police station around 2:30 or 2:45 p.m. Montalto did not have any further contact with Petitioner until 5:30 p.m., when Cuny asked Montalto to come to the interview room to witness a statement by Watson. Montalto noted that Petitioner recanted the statement he had apparently made to Cuny. Montalto was in the interview room with Watson for about five minutes. Subsequently, Petitioner was taken to an interview room in the booking area, in a room next door to his brother, Harris. Between the two rooms was a small two-way mirror and a speaker. Watson got on the speaker and made some comments to his brother "about giving him up or something to that effect." When Montalto and the other officers heard the comments, they took Harris to a different room.


Officer Montalto further testified that he brought a McDonald's dinner to Watson around 6:30 p.m. The next time he had any contact with Petitioner was around 8:15 p.m., when he went into the interview room to collect Watson's garbage from dinner and to ask him if he needed to go to the bathroom. Subsequently, Watson asked Montalto "what was going on." Montalto told Watson that the only information he had was that "some of our detectives had gone back to the house on Linder and served a search warrant and had recovered a couple of items, not knowing what they were. And then they were on their way back to the station at this point." Petitioner

then told Montalto that he wanted to talk to him, and Watson then made an admission with respect to the shooting in question. The conversation between Watson and Montalto lasted approximately thirty minutes.  About 8:45 p.m., Montalto called Officer Spika into the interview room, and Petitioner reiterated his incriminating statements in the presence of Spika. That conversation ended about 9:00 p.m.  Watson then requested to speak to Assistant State's Attorney Brian Nigohosian ("Nigohosian"), who had spoken with Petitioner earlier in the day.  Nigohosian arrived at the Lombard police department about 9:20 p.m.   Montalto and Spika then talked with Nigohosian for about 10 minutes concerning the statements Watson made. With Officers Montalto and Spika present, Nigohosian then spoke to Watson until 10:00 p.m., during which time the defendant again made admissions.

According to Montalto's testimony, around 10:00 p.m., it was decided that Watson's statement should be tape-recorded. Montalto and Nigohosian left the room to find a tape recorder and batteries. While they were looking for batteries, the receptionist in the lobby advised Montalto that an attorney was in the lobby and wanted to speak with Petitioner.  Montalto immediately told Nigohosian about the attorney; Watson was not interviewed any further.  This was the first time that Montalto was aware that an attorney for the defendant was at the police station or on the way to the police station.

Nigohosian testified that around 1:00p.m. on June 7, 1994, he had a 20-minute conversation with Watson at the Lombard police station. During the conversation, Nigohosian told the defendant that "[Twitty] had seen him, or words to that effect, and identified him as being the shooter."  Later that same day, around 9:00 p.m., Nigohosian was paged, and returned to the Lombard police station. He arrived about 9:20 p.m. and entered through the lobby. At the

time, he did not see anyone else in the lobby area. Further, Nigohosian testified when he arrived at the station, he knew that the police had executed the search warrant and had recovered bullets and a backpack with Petitioner's name on it. Nigohosian did not recall talking to Watson about the items recovered, as their conversation dealt mainly with Watson telling Nigohosian facts and details. Nigohosian's conversation with Petitioner in the presence of Montalto and Spika ended about 10 p.m., when Petitioner agreed to give a tape-recorded statement. While Nigohosian and the other officers were looking for a tape recorder, Nigohosian was informed that attorney Tod Urban ("Urban") had arrived at the police station to see the defendant. At that point, Nigohosian called his supervisor, then spoke with attorney Urban. Nigohosian went back to the booking area, and informed Watson that he wanted to see him. Petitioner indicated that he wanted to see the attorney. At that point, Nigohosian's conversation with Watson ceased.

At the evidentiary hearing, there was some dispute about the exact time Urban arrived at the Lombard police station. Urban testified that on June 7, 1994, he was in the midst of a trial at the criminal courts building, at 26th and California in Chicago, when he received a message from Watson's father. Urban spoke with Petitioner's mother over the telephone about 1:00 or 1:30 p.m. Urban told Watson's mother that he was in the midst of a trial and would not be able to get there until later. Urban made some phone calls and found out that Watson was located at the Lombard police department. Urban left for the Lombard police department around 7:30 p.m. Urban testified that he believed that he arrived at the Lombard police station around 8:30 or 8:45 p.m.

When Urban arrived at the police station, Watson's mother was already there. Urban had a conversation with her when he first walked into the station. Urban then went to the front desk,

identified himself, and asked to see Watson. Urban stated that he waited "a minimum of probably five minutes and maybe no more than forty-five minutes" before he saw the defendant. Urban claimed that while he waited in the lobby he was anxious to see Watson, and he went up to the front desk several times. Urban noted that an Assistant State's Attorney eventually came out and explained to him that the defendant had just finished making a statement and they were about to record it. Urban told the police that there would not be a recording of any statement and that all conversations with the defendant would cease. To Urban's knowledge, his request was honored.

Delores Harris, Watson's mother, also testified at the evidentiary hearing. Delores Harris testified that in June 1994, she lived at 1628 North Linder, in Chicago, in a second-floor apartment with her two sons (Watson and Changa Harris). Delores stated that the building is a "two-flat", but has three separate apartment. She noted that her brother and uncle lived in the basement, and Petitioner's sister lived on the first floor. When the police came to arrest Watson around 10:30 a.m., she was in the first-floor apartment getting ready for work. She noted that the police returned around 6:00 p.m., and searched the building. When the search was completed, the police took her to the Lombard police station. Delores Harris did not recall what time she arrived at the Lombard police station. After she arrived at the station, Delores Harris talked with Urban in the lobby area. Delores Harris did not know what time it was when she saw Urban at the station.


After an examination of the evidence, the trial court denied Watson's motion to suppress the statements that he made to the police officers and Nigohosian following his arrest. The trial court specifically found that Watson was not denied his right to an attorney. The trial court

found that Urban probably arrived at the Lombard police station sometime after 10:00 p.m., made his presence known, and was immediately led to the back of the station. With respect to Urban's claims that he had made phone calls to the Lombard station, the trial court noted that Urban did not testify to anything more than "I'm looking for Svondo Watson." Moreover, Urban did not ask to speak with Petitioner, and did not direct that police officers not speak with Watson. The trial court also found that Petitioner initiated the after-dinner conversation with Officer Montalto, and Montalto merely responded to Watson's question about what was going on in the case, and that Montalto did not confront Petitioner with any specific items that had been recovered in the search. Consequently, the trial court concluded, Watson was not under "interrogation" when he made the inculpatory statements to the police and was not "confronted" with the proceeds from an unlawful search.

Subsequently, the second jury trial proceeded, and on April 24, 1998, Watson was convicted of first degree murder, attempted murder, and aggravated battery with a firearm. The jury did not find, however, that Watson had inflicted severe bodily harm upon Twitty when it found him guilty of attempted first degree murder. Absent the finding of the infliction of severe bodily harm, the Illinois sentencing statute (730 ILCS 5-8-4(a)) mandates that all sentences be concurrent. However, on or about July 29, 1998, the trial court found that Watson had inflicted severe bodily harm upon Twitty, and sentenced Watson to 60 years for murder, and 30 years each for attempted murder and aggravated battery. The 30-year sentences were to be served concurrently with each other, but consecutively to the 60-year sentence, because, with a finding of the infliction of severe bodily harm, the sentencing statute compelled the imposition of consecutive sentences.

Subsequently, Watson appealed to the Illinois Appellate Court. On appeal, Watson alleged: (1) that his confessions were the tainted fruit of evidence that was illegally seized earlier in the day; and (2) he was denied his right to counsel under the Sixth Amendment of the United States Constitution and the Illinois Constitution when the Lombard police failed to inform Petitioner of Urban's efforts to reach him. On July 20, 2000, the Illinois Appellate Court, Second District, affirmed Petitioner's conviction and sentence. On August 22, 2000, that court issued a modified order upon denial of rehearing. People v. Watson, 2-98-1125 (unpublished order under Illinois Supreme Court Rule 23).

The Illinois Appellate Court found that Petitioner clearly waived his right to silence, and counsel, by stating that the understood his rights, and by agreeing to talk with the officers throughout the day without asserting those rights until sometime after the statements were made. Further, the Illinois Appellate Court found that even if Watson was subjected to "custodial interrogation," at the time of the statements, those statements were admissible. In addition, the Illinois Appellate Court held that the trial court correctly concluded that Watson was not confronted with the proceeds of an illegal search, as the Illinois Appellate Court determined that nothing in the record indicated that Watson was aware that the police had recovered any incriminating evidence during their search. Further, the Illinois Appellate Court found that Watson failed to show a sufficient connection between the illegal search and his confession. Finally, in regards to Watson's argument that his Sixth Amendment right to counsel attached by 5:30 p.m. on June 7, 1994, due to Nigohosian's adversarial involvement, the Illinois Appellate Court held that prosecutorial involvement in this case was not significant enough to warrant a finding that Watson's Sixth Amendment right to counsel had attached. The Illinois Appellate

Court found that the prosecutor did not gather any of the information contained in the warrant, and did not personally view the building that was the site of the search. Further, the State Appellate Court found that Officer Alagna gathered all of the information in the warrant through his own investigation, and the prosecutor simply assisted Officer Alagna in typing the warrant and then presenting it to the judge. In addition, the Appellate Court found that there was an absence of any prosecutorial involvement in Watson's arrest. The Appellate Court found that Lombard police mostly questioned Watson throughout the day.

Subsequently, Watson filed a petition for leave to appeal to the Illinois Supreme Court. In his petition, Watson alleged: (1) the appellate court improperly held that the connection between the illegal search and Watson's confession could only be shown by Petitioner's confrontation with the specific proceeds of the search; (2) the appellate court's finding of attenuation between the search and the confession was constitutionally erroneous; (3) when ruling upon the validity of Petitioner's waiver of rights, the appellate court unconstitutionally focused on the absence of interference with an attorney-client communication rather than on the validity of Watson's uninformed waiver; (4) the appellate court improperly ruled that Petitioner's right to counsel had not attached due to significant prosecutorial involvement in the pre-indictment proceedings; and (5) the appellate court's affirmance of Watson's convictions was based upon factual determinations that lacked evidentiary support and thus violated Watson's right to due process of law. On November 29, 2000, the Illinois Supreme Court denied Watson's petition for leave to appeal. On November 27, 2001, Watson filed his petition for writ of habeas corpus that is presently before this Court.

## II. Habeas Corpus Standard

A writ of habeas corpus remedies a situation where a petitioner is held "in custody in violation of the Constitution or laws of or treaties of the United States." Coleman v, Thompson, 501 U.S. 722, 730 (1991). Before a federal court can reach the merits of a petition for a writ of habeas corpus under 28 U.S.C. § 2254, the petitioner must exhaust the available state court remedies. Habeas corpus petitioners exhaust all of their state court remedies when: (1) they present them to the highest court of the state; or (2) no state remedies remain available to the petitioner at the time that the federal petition is filed. See Farrell v. Lane, 939 F.2d 409, 410 (7th Cir. 1991).

Procedural default is also a barrier that generally prohibits a federal court from examining the merits of a habeas corpus petition. Procedural default occurs either when: (1) a petitioner fails to raise an issue on direct appeal or post conviction review, See Farrell, 939 F.2d at 410; or (2) the state court clearly relies on a state procedural bar as an independent basis for its denial of relief. See Caldwell v. Mississippi, 472 U.S. 320 (1985). If a petitioner has procedurally defaulted on any claim, this Court can only grant relief if: (1) there is adequate cause for his failure to raise the claim in state court and prejudice resulting from the default–i.e., "cause and prejudice" Wainwright v. Sykes, 433 U.S. 72, 87 (1977); or (2) default would result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

Even where a federal court reaches the merits of a petitioner's claims, relief is only warranted in certain circumstances. To prevail, a habeas corpus petitioner must show that adjudication of the case resulted in a decision that was: (1) contrary to, or (2) an unreasonable application of clearly established federal law as determined by the United States Supreme Court;

or, (3) based on an unreasonable interpretation of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. 2254 (d). The first ground pertains to pure questions of law. <u>Lindh v. Murphy</u>, 96 F.3d 856, 868-69 (7th Cir. 1996), <u>rev'd on other grounds</u>, 521 U.S. 320 (1997). The second ground pertains to mixed questions of law and fact. <u>Id</u>. at 870. To warrant relief, the state-court error must be "grave enough to be called 'unreasonable'" <u>Id</u>. A state court conclusion will stand if it is "one of several equally plausible outcomes." <u>Hall v. Washington</u>, 106 F.3d 742, 749 (7th Cir. 1997). A state court's application of Supreme Court precedent is reasonable if it is "at least minimally consistent with the facts and circumstances of the case." <u>Hennon v. Cooper</u>, 109 F.3d 330, 335 (7th Cir. 1997). Finally, the third ground contemplates relief only where the facts are by "clear and convincing evidence," demonstrably wrong. <u>See</u> 28 U.S.C. 2254(e)(1).

## III. Discussion

Watson presents eight issues in his habeas petition. Watson contends: (1) his confessions were inadmissible, because those confessions immediately followed his notification of a search premised upon a search warrant complaint in which an apartment building had been misrepresented as a house and the officers who executed the warrant broke into a locked bedroom and a locked safe in an apartment other than the one in which Watson resided; (2) the state courts improperly held that the connection between the illegal search and Petitioner's confessions could only be shown by his confrontation with the specific proceeds of the search, and his confessions should have been suppressed because they followed in immediate temporal proximity to Petitioner's knowledge of that illegal search; (3) the Illinois appellate court improperly found attenuation between the illegal search and Petitioner's confessions when it

contrived facts that contravened the trial court record, and then premised its decision upon those facts, and did not consider a Brown factor that clearly showed the complete lack of attenuation (and found sufficient the state's presentation of some evidence of other factors); (4) his confessions were inadmissible where one or more of those confessions occurred while Petitioner's attorney, although present at the police station, was denied access to him until the completion of a series of interrogations that resulted in those confessions; (5) the appellate court erred when it found that Petitioner's right to counsel had not attached due to significant prosecutorial involvement against Petitioner when the prosecutor twice interrogated Petitioner for the purposes of obtaining a confession, misinformed Petitioner about a witness' identification of him, otherwise gathered evidence against him, and helped police draft and present to a judge a search warrant complaint that contained knowing misrepresentation of material fact; (6) his right to due process of law was violated when, to affirm Petitioner's convictions, the State Appellate Court ignored the evidence presented at trial, and instead fabricated sham facts that contravened the record; (7) his consecutive sentences are illegal because, after his conviction by a jury, the judge found the existence of a fact, other than a prior conviction, that required Petitioner's sentences to run consecutively, rather than concurrently; (8) his right to due process of law was violated by the Illinois Supreme Court's breach of its own rules when it denied Petitioner's appeal as a matter of right.  As an initial matter, the Court notes that the arguments for Plaintiff's sixth ground for relief are incorporated into his other arguments.  As a consequence, the Court will incorporate claims of factual disparities into the remaining grounds for relief.

### A.  Fourth Amendment Claims

Watson's first, second and third grounds for relief are Fourth Amendment claims. First, Watson contends that his confessions should have been deemed inadmissible, because they immediately followed his notification of a search that was premised upon a search warrant complaint where an apartment building had been misrepresented as a house, and the officers who executed the warrant broke into a locked bedroom and a locked safe in an apartment other than the one in which Watson resided. Second, Watson contends that the State courts improperly held that the connection between an illegal search and Petitioner's confessions could only be shown by his confrontation with the specific proceeds of the search, and that the proceeds should have been suppressed because they followed in immediate temporal proximity to Watson's knowledge of that illegal search. Third, Watson contends that the Illinois appellate court improperly found attenuation between the illegal search, and Watson's confessions, and premised its decisions on facts not in the record. In addition, Watson's third claim contends that the Appellate court did not consider a <u>Brown</u> factor that clearly showed the complete lack of attenuation (and found the State's presentation of "some evidence" to be sufficient when evaluating the other factors).

The Supreme Court has created a rule which forecloses federal court review of Fourth Amendment claims in habeas petitions. <u>See</u> <u>Stone v. Powell</u>, 428 U.S. 465 (1976). Federal habeas courts can only review Fourth Amendment exclusionary rule claims when the petitioner has been denied an opportunity for a full and fair litigation in the state court. A habeas petitioner is considered to have an "opportunity for full and fair litigation of his or her Fourth Amendment claim when: (1) the petitioner has clearly informed the state court of the factual basis for that claim and has argued that those facts constitute a violation of the petitioner's Fourth Amendment rights; and (2) the state court has carefully and thoroughly analyzed the facts and applied proper

constitutional case law to the facts." Pierson v. O'Leary, 959 F.2d 1385, 1391 (7th Cir. 1992).

Watson argues that the Illinois Appellate Court failed to consider one of the four factors enumerated under Brown v. Illinois, 422 U.S. 590 (1975), in determining whether his confessions were sufficiently attenuated from the illegal search and seizure.  Pursuant to Brown, in order to determine whether the taint of an unlawful seizure has sufficiently dissipated so as to allow admission of a subsequently acquired statement, a court must consider: (1) the presence of Miranda warnings; (2) the temporal proximity of the arrest to the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct.  Id. at 603-604.  Petitioner maintains that the Appellate Court did not consider the third factor, the presence of intervening circumstances.  Neither the State trial court, nor the Illinois Appellate Court, specifically used the phrase "intervening factor" in their findings; however, both state courts discussed the fact that Watson specifically asked what is going on, and where are the other police officers, prior to making his statement.  In addition, both state courts discussed the fact that Watson was aware that Twitty survived, yet another intervening factor.  Consequently, both the trial court and the Illinois Appellate courts properly considered all Brown factors that would determine whether Brown's statements were sufficiently attenuated from the illegal search.[3]

---

[3] Petitioner contends that the Appellate Court improperly used the "some evidence" standard, meaning that the State was only required to put forth some evidence that the challenged evidence was obtained by means sufficiently distinguishable to be purged of the primary taint.  If the Illinois Appellate Court used this standard, it would be incorrect.  However, the Illinois Appellate Court did cite the correct standard: once a defendant establishes the illegality of police conduct, and shows its connection to what is alleged to be the fruit of that illegality, the State has the burden of proving, *by clear and convincing evidence*, that the challenged evidence was purged of the primary taint.  See Brown, 422 U.S. at 604; see also People v. Turner, 631 N.E.2d at 1245 (Ill. App. Ct. 1994) (emphasis added).  Although the Illinois Appellate court occasionally chose to use the phrase "some evidence" (i.e., "The State presented some evidence....) there is no indication that the Appellate Court applied the erroneous legal standard when evaluating

Further, Petitioner contends that the Appellate Court did not address the "purpose" aspect of the fourth <u>Brown</u> factor, as it relates to the officer's labeling 1628 North Linder as a house as opposed to a multi-unit building. Watson contends that this fact is particularly noteworthy because the trial court found that there was a reckless disregard for the truth, and that the officers did know as early as 10:30 in the morning that there were multiple units, and they did not disclose that to Judge Hennessy when procuring the search warrant. <u>See</u> Watson Tr., pp. 002733-002734. However, the trial court did not specifically make a finding of purposefulness, and would not say, even in the face of defense counsel's questions, that the officers lied. <u>Id.</u> In addition, the Appellate Court addressed Montalto's intent, which goes to the issue of purpose, when it stated that Montalto did not evince an intent to exploit the misconduct in this case, as he did not tell Watson what had been recovered during the search. Consequently, the Illinois Appellate made a reasonable interpretation of the trial evidence, and applied the proper legal standard.

The trial court conducted a full hearing on whether Watson's statements should be admissible at trial, and accepted testimony and evidence from all relevant witnesses. After an examination of the evidence, the State trial court decided that Watson's statements were admissible. Petitioner clearly informed the State Courts of the factual basis for his claim, and the State Court carefully and thoroughly analyzed the facts and applied the proper constitutional standard. Therefore, this Court cannot engage in review of the State Court's decision to admit the evidence. Consequently, Watson's claims for habeas relief based on the alleged Fourth Amendment violations must be denied.

_____

Watson's claims.

### B.  Petitioner's Claim of Denial of Access to Counsel

In his fourth stated ground for relief, Watson contends that his confessions were inadmissible, as one or more of those confessions occurred while Petitioner's attorney, although present at the police station, was denied access to him until a series of interrogations that resulted in subsequent confession ceased.

The Appellate Court applied the applicable standard for Sixth Amendment right to counsel claims.  "[A] suspect's right to counsel is invalid if police refuse to inform a suspect***of the efforts of the attorney, present at the place of interrogation, to render assistance to the suspect.  To hold to the contrary would be to condone 'affirmative police interference in a communication between an attorney and a suspect." People v. Griggs, 604 N.E.2d 257, 269 (Ill. 1992) (citing  Moran v. Burbine, 475 U.S. 412, 456, n.42 (1986)).  In addition, in Illinois, the physical presence of the attorney is not required; the Sixth Amendment right to counsel also applies when the attorney is trying to contact a defendant by telephone, and is prevented from doing so by police.  See People v. Milestone, 671 N.E.2d 51 (Ill. App. Ct. 1996).  After applying the applicable case law to Petitioner's facts, the Appellate Court held that the trial court did not err in finding that Watson was not denied his right to an attorney.   Further, the Appellate Court determined that it could not find that the State Court's factual findings, as they related to Urban, were "manifestly erroneous."

The facts, as established by the Illinois States courts, are not rebutted by clear and convincing evidence.  There is no clear evidence that Urban arrived to the Lombard police station prior to 10:00 p.m.  Nor is there any clear evidence that Watson was further interrogated once his right to counsel attached.  Further, there was no clear evidence that Petitioner's right to counsel

attached when Urban called the police station, because the record does not indicate that Urban

identified himself as Watson's counsel when he called the police station.  Because the State

Courts' interpretations of the facts were reasonable in light of the evidence presented, Watson is

not entitled to habeas relief on this ground.

> ### C.  Did Petitioner's Right to Counsel Attach Due to Significant Prosecutorial
> ### Involvement

Petitioner argues that the Appellate Court's findings as to prosecutorial involvement by

Nigohosian are belied by the facts actually entered into evidence at the trial court level.

Petitioner contends that while the Court found that Nigohosian did not gather the information

contained in the warrant, the trial testimony shows that he actually did.  In addition, Petitioner

contends that while the Appellate Court stated that the prosecutor simply assisted Alagna in

typing the warrant, Nigohosian actually interrogated Watson twice, and Harris once, for

evidence.  Petitioner contends that there was significant prosecutorial involvement, and Watson's

right to counsel should have attached earlier than the Illinois Appellate Court found that it did.

Further, Petitioner asserts, Nigohosian was convinced, by the time he spoke to Watson, that the

police had apprehended the right suspect (See Watson Ex. 2, p. C-1107).  Petitioner believes this

is further evidence that Nigohosian had significant prosecutorial involvement, and that the Sixth

Amendment right to counsel had attached.

The Sixth Amendment right to counsel attaches at or after the initiation of adversarial

judicial proceedings, whether by way of formal charge, preliminary hearing, indictment,

information, or arraignment.  Kirby v. Illinois, 406 U.S. 682, 68-89 (1972). In Illinois state

courts,  the level of prosecutorial involvement may be considered in determining whether a

defendant's Sixth Amendment right to counsel has attached.  See People v. Garrett, 688 N.E.2d 614, 618 (Ill. 1997).

The Illinois Appellate Court found that there was nothing in the record to indicate that the State had made any decision to charge Watson during the time his statements were made.  In addition, the Illinois Appellate Court found that there was no indication that the prosecutor had any significant involvement in procuring the search warrant for Petitioner.  Further, the Illinois Appellate Court found that the prosecutor simply assisted Alagna in typing the warrant and presenting it to the Judge, and that the Lombard police officers were mostly responsible for questioning Watson.

Because this is a mixed question of law and fact, the Court must determine if the Illinois Appellate Court's ruling was an unreasonable interpretation of clearly established federal law,  as determined by the United States Supreme Court.  After an examination of all of the evidence, this Court finds that the Illinois Appellate Court, after examining the proper federal standard, made a reasonable interpretation of federal law, as applied to the facts before the Illinois Appellate Court.  The Illinois Appellate Court did find that Nigohosian had some involvement with Watson other than typing the warrant.  Namely, the Illinois Appellate Court did find that Nigohosian did some questioning of Petitioner, but that the Lombard police officers were primarily responsible for questioning Watson.  Pursuant to the trial court record, this was a reasonable interpretation of the facts of the case. Nigohosian's agreement with the statement, that by the time he talked with Watson, he knew all the details of the case, and he knew that the police apprehended the right person, still does not deem the State Court's findings unreasonable.  This statement does not clearly demonstrate that Nigohosian assisted in the gathering of evidence prior to formal charges.

In addition, it does not demonstrate that Nigohosian, prior to formal charges (and most importantly prior to speaking with Watson) had taken upon the type of adversarial role that would invoke Watson's Sixth Amendment right to counsel. There is nothing in the record to indicate that Nigohosian's involvement was more than as indicated by the Illinois Appellate Court, which was typing up the warrant, some role, and had some, but not most of the responsibility for questioning Watson. Consequently, Watson is not entitled to habeas relief on this claim.

——————

### D. Is Petitioner's Consecutive Sentence Illegal?

Petitioner claims that his consecutive sentence is illegal because the trial court judge, rather than the jury, found the facts necessary for a consecutive sentence. As an initial matter, Plaintiff never presented this claim to the State Court. Procedural default is a barrier that generally prohibits a federal court from examining the merits of a habeas corpus petition. As previously noted, procedural default occurs either when: (1) a petitioner fails to raise an issue on direct appeal or post conviction review, See Farrell, 939 F.2d at 410; or (2) the state court clearly relies on a state procedural bar as an independent basis for its denial of relief. See Caldwell v. Mississippi, 472 U.S. 320 (1985). If a petitioner has procedurally defaulted on any claim, this Court can only grant relief if: (1) there is adequate cause for his failure to raise the claim in state court and prejudice resulting from the default–i.e., "cause and prejudice"– Wainwright v. Sykes, 433 U.S. 72, 87 (1977); or (2) default would result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

Petitioner asserts that he was denied the fair opportunity to present this claim, because

even if he had, the Illinois Supreme Court improperly denied his petition for leave to appeal as a matter of right. However, because Watson did not address the claim in his petition to the Illinois Supreme Court, even if the Illinois Supreme Court did grant his petition, this claim would not have been considered. Further, even if Petitioner had raised the issue to the Illinois Supreme Court in his petition, it would have been procedurally defaulted, since raising an issue for the first time in a discretionary proceeding is insufficient to avoid a default. Castille v. Peoples, 489 U.S. 346, 351 (1989). Consequently, Watson is procedurally defaulted from presenting his sentencing claim to this Court.[4]

### E. Was Petitioner's Right to Due Process of Law Violated When the Illinois Supreme Court Denied His Appeal?

Petitioner notes Illinois Supreme Court Rule 317, which states, "Appeals from the Appellate Court shall lie to the Supreme Court as a matter of right in cases in which a question under the Constitution of the United States or of this State arise for the first time in and as a result of the action of the Appellate Court."

Petitioner contends that he raised four constitutional questions that arose for the first time as a result of the Appellate Court's actions. Watson contends that those questions include the Fourth and Sixth Amendment claims presently before this Court. In addition, Petitioner asserts that he raised allegations that the state appellate court had misapplied Brown v. Illinois, had

---

[4] Petitioner argues that his claim is similar to that of Lynce v. Mathis, 519 U.S. 433 (1997), where the Supreme Court stated that a petitioner need not exhaust state remedies prior to bringing a claim that the retroactive cancellation of provisional credits violated the *Ex Post Facto Clause* of the United States Constitution, as exhaustion would have been futile. Id. at 436. However, Lynce decision is limited to *Ex Post Facto* clause claims; Petitioner's claim of an illegal sentence does not fall within that rubric.

inserted a new evidentiary standard into the law of attenuation, and had premised those questions upon "facts" of the court's own creation and contrivance, thereby violating Watson's due process of law.

As an initial matter, Petitioner has not provided evidence of a Constitutional claim that has arisen for the first time. Watson's arguments are largely based on the contention that the Appellate Court misapplied Supreme Court precedent in affirming his conviction. However, this Court has determined that the Illinois Appellate Court properly applied Supreme Court precedent. Further, even if the Illinois Appellate Court had been found to have misapplied the applicable precedent, this does still not mean that Watson's claims amounted to a constitutional issue arising for the first time. In addition, whether the Illinois Supreme Court decides that a particular case falls within its jurisdiction is considered the State's interpretation of its own procedural rules. The interpretation by the state of its own procedural rules is not a basis for federal habeas relief, as this issue does not address a violation of the Constitution or laws of the United States. See Britz v. Cowan, 192 F.3d 1101, 1103 (7th Cir. 1999). Consequently, Petitioner is not entitled to habeas relief on this ground.

### F.  Additional Matters

_____In his petition, Watson states that the Appellate Court omitted relevant facts which cast doubt on Watson's guilt. For example, Watson contends, the Appellate Court did not mention that the officers who went to 1628 North Linder Avenue on the morning of June 7, 1994, testified that they walked past Watson when they encountered him in from of the building, but arrested Harris, Watson's half-brother, because he fit Twitty's description of the shooter. In addition, Petitioner maintains that his three confessions did not conform to certain known facts

and were inconsistent with each other, which to Petitioner is indicative that he was not conversant with the facts of the shooting and was trying to protect Harris. In addition, Watson maintains that the Appellate Court failed to mention that Watson's grandmother and minister testified that at the time of the shooting in Lombard, Watson was with them in Chicago as they finished a radio broadcast.

Although Watson is correct that the Illinois Appellate Court did place these facts into its opinion, the record is still clear that the Appellate Court carefully considered the pertinent factors in the trial court record, carefully applied the applicable Constitutional factors, and made its decision that the trial court's evidentiary findings were sound. These aforementioned facts do not contravene the findings of the Illinois Appellate Court.

## IV. Conclusion

For the foregoing reasons, Watson's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED. This case is CLOSED.

Enter:

/s/ David H. Coar

_____

David H. Coar

United States District Judge

Dated: **March 31, 2005**